**Aitza FIGUEROA TELEMACO,**
**Plaintiff,**

v.

**MOBILE PAINTS MANUFACTURING CO., INC., et al., Defendants.**

**No. CIV. 05–1205(JAF).**

United States District Court,
D. Puerto Rico.

March 14, 2006.

**442**

Jose M. Casanova–Edelman, San Juan, PR, for Plaintiff.

Grisselle Gonzalez–Negron, Faccio & Pabon Roca, San Juan, PR, for Defendants.

### OPINION AND ORDER

FUSTE, Chief Judge.

### I.

### Background

Plaintiff, Aitza Figueroa Telemaco, filed the present action against Defendants, Mobile Paints Manufacturing Co., Inc. ("Mobile Paints"), an unnamed insurance company, and an unnamed third party, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended ("Title VII") (2003 & Supp.2005). Plaintiff alleges that she was discriminated against based on her sex and race, and various violations of Commonwealth law. *Docket Document No. 1.*

### II.

### Factual and Procedural Synopsis

We derive the following factual summary from the parties' statements of uncontested facts, as well as from the narrative developed in our December 21, 2005, Opinion and Order. *Docket Document Nos. 13, 19, 25.*

Plaintiff is a black woman who lives in Carolina, Puerto Rico. After applying and interviewing for a job with Mobile Paints, Plaintiff received a phone call from the company's Human Resources Director Raquel Hernández ("Raquel") in October 2001 inviting her to the office to receive a job offer. During that phone conversation, Plaintiff told Raquel that she was pregnant, and Raquel responded that it would be no problem, and that there was no requirement that Plaintiff reveal her pregnancy to the company before receiving her job offer.

Plaintiff visited Mobile Paints' Sales Manager Elba Hernández ("Elba") on October 29, 2001; she was offered a job as a data entry clerk, signed an employment contract, and began working for the company shortly thereafter. Plaintiff eventually told Mobile Paints' Vice President Louis Petit of her pregnancy in or around December 2001, and he, like Raquel, also said that it was no problem. In a March 15, 2002, letter, Petit formally wished Plaintiff good luck, congratulations, and approved maternity leave from March 18, 2002, until May 12, 2002. She gave birth to a boy, Bryan, on March 27, 2002.

On March 11, 2003, Figueroa sent a letter to Petit and Elba complaining that Mobile Paints had failed to increase her

salary since at least September 2002, even though it had, due to a reduction in personnel, been increasing her responsibilities to include those of a credit manager during the same period. Credit Manager Javier Vélez, for instance, who had been Plaintiff's direct supervisor, had been dismissed some time in 2002 due to Mobile Paints' precarious financial situation. Because she thought her work arrangement as structured was exploitative, Plaintiff announced her decision that she would revert to performing only the duties for which she was originally hired and would stop performing credit-manager work.

On March 17, 2003, Petit convened a meeting with four Mobile Paints employees who were expecting raises—Plaintiff, Carlos Correa, Edwin Cruz, and Edwin Torruella—and informed them that salary increases would not be delivered as promised due to the company's financial difficulties.

In March 2003, in response to Plaintiff's statement that she would halt all credit-manager related activities, Elba asked Plaintiff's fellow employees to keep their eyes open to see if Plaintiff would in fact stop performing her sales department duties and, if so, to report back to her.

On March 31, 2003, Plaintiff handed a letter to Elba during a morning meeting complaining "that using other employees to try and open a file against [her] is very unprofessional. Harassing and persecuting an employee for the mere fact that she is pregnant or for asserting her rights as a person is considered a serious offense." After talking with Elba about the letter, Plaintiff sent a second letter later that same day, in which she had excised all mention of pregnancy discrimination, but reiterated her disgust that other employees had been asked to report back on her performance.

Petit and Elba allege that they first learned about Plaintiff's second pregnancy (while working at Mobile Paints) when they read the first March 31, 2003, letter alleging pregnancy-related harassment. Plaintiff alleges that they learned about her pregnancy earlier, from office rumors. In any event, the discrimination allegations prompted Petit to write to Plaintiff on April 4, 2003, requesting "that you immediately indicate in writing whether you believe that, in fact, you have been the object of pregnancy discrimination at Mobile Paints. If your answer is yes, we will immediately activate our procedure to solve internal complaints for discrimination to get details of your allegations, investigate, assign responsibilities, and take the corresponding corrective measures, if any violation of law or of our policy is found."

After receiving the April 4, 2003, letter, Plaintiff verbally answered Petit's question and told him that she had not been subject to pregnancy discrimination. When she gave Petit a full written response to his letter on April 9, 2003, however, the correspondence failed to make that statement in writing. Petit sent Plaintiff yet another letter on April 10, 2003, once again asking her to respond to his discrimination question in writing because it was his duty to investigate such allegations as an officer of Mobile Paints. Later that same day, Plaintiff responded in writing that "at this time I do not feel discriminated against because of my pregnancy... I have *never* informed [sic] that I have been or am the object of any type of discrimination. In addition, after Mrs. Hernández and I met, discussed, and clarified the misunderstandings, I took back what I had said and handed in a corrected memo [the second March 31, 2003, letter] with details about what had happened."

Plaintiff began her second maternity leave on August 22, 2003. She gave birth to a girl, Shaira, on September 17, 2003, and returned to work on October 25, 2003.

On November 10, 2003, Plaintiff sent an email to Petit applying to be an Accountant/Administrator at Mobile Paints. On November 11, 2003, Petit sent Plaintiff a letter informing her that she was not qualified for the position because the successful applicant was required to have a bachelor's degree in either accounting or management, and Plaintiff had neither.

On November 21, 2003, Petit, Elba, and Mobile Paints' operation manager, William Vera, called a meeting with Plaintiff to inform her that her employment was terminated due to the company's ongoing economic crisis. Mobile Paints maintains that the Plaintiff was terminated for purely economic reasons, but Plaintiff asserts that an advertisement appeared around the time she was terminated in the EL NUEVO DÍA newspaper soliciting applicants for an Accountant/Administrator position. The Accountant/Administrator classified ad, according to Plaintiff, included in the job description some of her responsibilities.

Plaintiff filed this Title VII complaint alleging race and sex discrimination, which includes supplemental claims under Puerto Rico law, on February 22, 2005. *Docket Document No. 1.* Mobile Paints filed its answer on July 5, 2005. *Docket Document No. 5.* Mobile Paints now moves for summary judgment, *Docket Document No. 18,* and Plaintiff opposes. *Docket Document No. 25.*

## III.

### *Summary Judgment Standard under Rule 56(c)*

The standard for summary judgment is straightforward and well-established. A district court should grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004).

The moving party carries the burden of establishing that there is no genuine issue as to any material fact, though the burden "may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden has two components: (1) an initial burden of production that shifts to the nonmoving party if satisfied by the moving party; and (2) an ultimate burden of persuasion that always remains on the moving party. *Id.* at 331, 106 S.Ct. 2548.

The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment exists "to pierce the boilerplate of the pleadings and assess the proof in order to determine the need for trial." [1] *Euromodas, Inc. v. Zanella,* 368 F.3d 11, 17 (1st Cir.2004) (citing *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992)).

---

1. Discovery in this litigation closed on December 16, 2005, and the case's current factual record is, therefore, complete and final. We make that observation explicit because Plaintiff's counsel oddly suggests that we cannot grant summary judgment for Mobile Paints unless "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Docket Document No. 25* (citation omitted). Unfortu-

## IV.

### *Legal Analysis*

Plaintiff makes two claims under Title VII: One for race discrimination and one for sex discrimination. Mobile Paints argues that Plaintiff's race discrimination claim should be dismissed because: (1) she has not presented any relevant factual allegations; and (2) she has explicitly questioned whether she was the victim of race discrimination in a deposition. *Docket Document No. 23, Exh. 3* (In response to the interviewer's request for information pertaining to racial discrimination, Plaintiff responded "My discrimination, directly or indirectly, I can't say that it was because I am black ... My discrimination has been... or my harassment has been for the mere fact that I got pregnant again and requested a revision. That was all that's led to this situation."). Because Plaintiff does not challenge Mobile Paints' position, we dismiss the portion of her complaint pertaining to race discrimination.

█ Plaintiff's sex discrimination claim alleges that she has been the victim of pregnancy discrimination. *Docket Document No. 25, Exh. 3* (Plaintiff explains that she was discriminated against "[n]ot because I was a woman but because I was continuously pregnant"). Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). In response to a Supreme Court decision holding that sex discrimination did not proscribe pregnancy discrimination, *General Elec. Co. v. Gilbert*, 429 U.S. 125, 145–46, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), Congress passed the Pregnancy Discrimination Act of 1978, which amended Title VII to define sex discrimination to include discrimination on the basis of childbirth, pregnancy, and related medical conditions. 42 U.S.C. § 2000e(k) ("The term 'because of sex' or 'on the basis of sex' include ... because of or on the basis of pregnancy, childbirth, or related medical conditions."). It is, therefore, well settled that an employer may not discharge an employee based on the categorical fact of her pregnancy or for taking an authorized maternity leave. *Hernández–Mejías v. General Electric*, 2005 WL 2138819 at *11 (D.P.R. 2005).

### A. *McDonnell Douglas Standard*

Although Plaintiff presents no smoking gun evidence of pregnancy discrimination,[2] she may prove her allegations with circumstantial evidence. *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000). When faced with circumstantial evidence, courts use the

---

nately for Plaintiff, her counsel misunderstands the basic legal concept of summary judgment. We shall conduct our analysis considering nothing more than the set of facts as they currently appear in the record, because neither party has the opportunity for further factual development in this case. *Roche v. John Hancock Mutual Life Insurance Co.*, 81 F.3d 249, 253 (1st Cir.1996) (holding that "[m]otions for summary judgment must be decided on the record as it stands, not on a litigant's vision of what the facts might some day reveal. Thus, speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion") (citations omitted).

2. Had Plaintiff been able to present direct evidence of discrimination, we would have employed the direct evidence model for analyzing employment discrimination claims as outlined by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 270–78, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (describing the direct evidence model).

*McDonnell Douglas* burden-shifting framework to determine whether a plaintiff has, in her aggregate package of proof, raised a genuine issue of fact, triable by jury, as to whether the termination was motivated by sex discrimination. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Santiago–Ramos,* 217 F.3d at 54.

The *McDonnell Douglas* framework requires that a plaintiff first establish a prima-facie case by demonstrating that: (1) she was within a protected class; (2) she met the employer's legitimate performance expectations; (3) she experienced an adverse employment decision by her employer; and (4) the employer filled the position by hiring another individual with similar qualifications. *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000); *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000); *see also Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 33 (1st Cir.2001). Once the plaintiff establishes a prima facie case, the presumption arises that the employer unlawfully discriminated against her. *Gonzalez v. El Dia, Inc.,* 304 F.3d 63, 68–69 (1st Cir.2002); *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 478 (1st Cir.1993); *Straughn,* 250 F.3d at 33. The burden of production then shifts back to the employer-defendant who must rebut the inference of discrimination by articulating some legitimate, non-discriminatory reason for the adverse employment action. *Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430 (1st Cir.2000).

Should the employer meet this burden, the inference of unlawful discrimination is dispelled, and the burden shifts to the plaintiff to show that the employer's alleged justification is a mere pretext for discrimination. *Id.; Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991); *Straughn,* 250 F.3d at 34. At this stage, the plaintiff must produce evidence beyond the mere assertion that the alleged justification is implausible and show that the employer's discriminatory animus actually motivated the adverse employment action. *See Hazen Paper v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Mesnick,* 950 F.2d at 825; *Santiago–Ramos,* 217 F.3d at 54. Throughout this analysis, the plaintiff must prove that she would not have suffered the adverse employment action but for her membership in a protected class. *See Freeman v. Package Mach.,* 865 F.2d 1331, 1335 (1st Cir.1988).

### B. *Plaintiff's Prima Facie Case*

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). An employee alleging sex discrimination must first establish a prima facie case by showing that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably-qualified person. *Santiago–Ramos,* 217 F.3d at 54. For the purposes of summary judgment Mobile Paints concedes prongs two and three of the test, viz., that Plaintiff performed her job satisfactorily and that she was fired. Mobile Paints challenges the first and fourth prongs of the test, however, viz., that Plaintiff belonged to a protected class and that it continued to have her duties performed by a comparably-qualified person. We shall take Defendant's challenges to the first and fourth prongs of Plaintiff's prima-facie case in turn.

### 1. *Membership in a Protected Class*

Mobile Paints argues that Plaintiff cannot establish a prima-facie case because

she cannot establish her membership in a protected class. *Docket Document No. 18.* According to Mobile Paints, Plaintiff did not belong to a protected class because she was not pregnant on November 21, 2003, when her employment with the company was terminated. *Id.*

This court, however, has held that Title VII's prohibition against pregnancy discrimination does not require "a strict temporal proximity between the condition and the date of termination" in order for a plaintiff to prove membership in a protected class. *Torres v. Cooperativa de Seguros de Vida de Puerto Rico,* 260 F.Supp.2d 365, 371 (D.P.R.2003). The record makes it clear that Plaintiff's maternity leave ended on October 25, 2003, less than one month before her discharge on November 21, 2003. Although Mobile Paints implies that the intervening month makes it impossible for the court to infer a causal nexus between the two events, we fail to see how such an approach would enact anything but a strict temporal proximity requirement. Plaintiff's discharge less than one month after her return from maternity leave certainly gives rise to a reasonable belief that the two events are related and we, therefore, hold that Plaintiff has satisfied the first element of her prima facie case. *Cf. Gonzalez v. Biovail Corp. Int'l,* 356 F.Supp.2d 68, 80 (D.P.R.2005) (holding that six months having passed between a plaintiff's protected status and her dismissal was too long to sustain Title VII action).

2. ***Replacement by a Comparably–Qualified Person***

 Mobile Paints also challenges Plaintiffs' satisfaction of the fourth element, but again, its argument misses the mark. In analyzing whether Plaintiff's duties continued to be performed by a comparably-qualified person after her ter-

mination, Mobile Paints argues that "[i]t is uncontested that [it] did not hire anyone for the position held by Plaintiff until her dismissal, i.e., data entry clerk." *Docket Document No. 18.* Whether or not Mobile Paints hired someone new for Plaintiff's job is irrelevant; a plaintiff can make out the fourth element simply by showing that the employer had a continued need for someone to perform the same work after the complainant left. *Cumpiano,* 902 F.2d at 155 ("[A] complainant can satisfy the fourth prong of her prima facie case simply by showing that, as here, the employer had a continued need for 'someone to perform the same work after [the complainant] left.'").

Although Plaintiff's filings do a poor job of presenting her prima-facie case in an organized, understandable manner, her depositional testimony reflects that an Accountant/Administrator (the position that Plaintiff had unsuccessfully applied for in the waning days of her Mobile Paints employment) performed her duties after her termination. *Docket Document No. 23, Exh. 3.* The fact that Plaintiff's duties had to be delegated to someone else within the company makes the necessary showing that Mobile Paints had a continuing need for someone to perform Plaintiff's work after her termination and we, therefore. hold that the fourth element of the prima-facie case is satisfied. *Cumpiano,* 902 F.2d at 155.

Given that Mobile Paints conceded prongs two and three of the test for a prima-facie case, and given our determination that prongs one and four have also been satisfied, we hold that Plaintiff has established a prima-facie case of pregnancy discrimination.

3. ***Mobile Paints' Legitimate, Non-discriminatory Reason***

 Establishment of the prima facie case effectively creates a legally mandato-

ry, rebuttable presumption that the employer unlawfully discriminated against the employee. *Burdine,* 450 U.S. at 254, n. 7, 101 S.Ct. 1089. Mobile Paints must, therefore, rebut the presumption of discrimination by producing evidence that Plaintiff was discharged for a legitimate, nondiscriminatory reason. *Id.*

■ Mobile Paints meets its burden by presenting evidence indicating that Plaintiff was not discharged because she was pregnant, but because the company was suffering financial difficulties and was trying to downsize. *Docket Document No. 19, Exh. 2* (Plaintiff's deposition testimony that the company's financial woes were cited in a March 17, 2003, meeting as the reason that salary increases were suspended); *Docket Document No. 19, Exh. 9* (Petit's April 4, 2003, letter summarizing the March 17, 2003, discussion and reiterating the company's need "to increase sales before making any salary revision or raise for our employees"); *Docket Document No. 19, Exh. 1* (Plaintiff's deposition testimony that her supervisor, Credit Manager Javier Vélez, had been fired for economic reasons some time in 2002). Because this evidence "would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," we hold that Mobile Paints has satisfactorily discharged its burden. *Burdine,* 450 U.S. at 257, 101 S.Ct. 1089 (stressing employer's burden is one of production, not persuasion);[3] *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("In the nature of things, the determination that a defendant has met its burden of production (and has thus rebutted any le-

gal presumption of intentional discrimination) can involve no credibility assessment. For the burden-of-production determination necessarily *precedes* the credibility-assessment stage."). The defendant's burden of production is to introduce evidence which, *if taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action. *Id.*

### 4. *Plaintiff's Evidence that Mobile Paints' Legitimate Reason is Pretextual*

"The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [her]'" because of her pregnancy. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742.

Plaintiff's opposition to Mobile Paints' summary judgment motion summarizes the evidence of discrimination she will present in this case, which is: (1) her deposition testimony that Mobile Paints advertised a job opening for a position sounding partly similar to hers around the time she returned from maternity leave, and shortly before she was discharged; (2) her deposition testimony that Raquel's response to her first pregnancy announcement in October 2002 was that she did not have to tell Elba about it before she received a firm job offer; and (3) her deposition testimony that she was subjected to an officially-sanctioned program of close peer supervision in March 2003, around the same time Elba and Petit first learned of her pregnancy. *Docket Document No.*

**3.** In *Burdine,* the Supreme Court addressed fears that a mere burden of production, not persuasion, would permit employers to compose fictitious reasons for adverse employment decisions. "[A]lthough the defendant does not bear a formal burden of persuasion, the defendant nevertheless retains an incentive to persuade the trier of fact that the employment decision was lawful. Thus, the defendant normally will attempt to prove the factual basis for its explanation." 450 U.S. at 258, 101 S.Ct. 1089.

25. We will consider these three categories of evidence in turn.

### a. *Newspaper Advertisement Describing Plaintiff's Duties*

█ Plaintiff's own deposition testimony states that Mobile Paints had posted a classified ad for a new employee shortly before she was discharged in November 2003. *Docket Document No. 23, Exh. 3.* Because some of Plaintiff's own duties—accounts receivable data entry—were listed as part of the successful applicant's expected job responsibilities, *id.,* Plaintiff argues that the classified ad shows that Mobile Paints' economic excuse for her discharge is a pretext for pregnancy discrimination because the company still planned to spend part of its personnel budget to pay someone to do her work. *Docket Document No. 25.*

Hiring a replacement data entry clerk would have potentially undermined the viability of Mobile Paints' justification for the termination. However, Plaintiff's own testimony reveals that Mobile Paints was not looking for a data entry clerk, but rather that the classified ad was for a higher-level employee—an Accountant/Administrator. *Docket Document No. 23, Exh. 3.* After she left Mobile Paints, two Accountant/Administrators split her former duties between them in addition to their other responsibilities. *Id.*

In *Weston–Smith v. Cooley Dickinson Hosp., Inc.,* 282 F.3d 60 (1st Cir.2002), the First Circuit determined that evidence that a Title VII plaintiff's job was absorbed into a higher-up's duties did not suffice to reveal an employer's downsizing defense as pretextual. According to the court, the fact that "reorganized jobs encompassed functions of former jobs [after a downsizing] is unsurprising... Functions rarely go away; but how functions are handled does change, and changes can lead to greater efficiency." *Id.* at 69. Indeed, Plaintiff's deposition testimony reveals that Mobile Paints had merged employee duties to downsize and achieve these efficiencies before: Her supervisor Credit Manager Javier Vélez, for instance, was terminated in 2002 and his duties shuffled to her desk. Absent further evidence that the decision to merge Plaintiff's job function into the Accountant/Administrators' positions was actually motivated by discrimination, then, we cannot view the mere fact that operations were streamlined at Mobile Paints as pregnancy discrimination. *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 424 (1st Cir.1996) ("Title VII · mandates that an employer must put an employee's pregnancy (including her departure on maternity leave) to one side in making its employment decisions—but the statute does not command that an employer bury its head in the sand and struthiously refrain from implementing business judgments simply because they affect a parturient employee.").

### b. *Raquel's Response to Plaintiff's First Pregnancy Announcement*

█ Plaintiff argues that Mobile Paints' streamlining efforts were motivated by discrimination by pointing out her deposition testimony that Raquel's response to her first pregnancy announcement was that it "was no problem" and that Plaintiff was not required to notify anyone regarding the matter in order to get a job offer. *Docket Document No. 25, Exh. 1.* We would initially like to note our confusion, aggravated by a lack of explanation by Plaintiff's counsel, as to how a reasonable fact-finder could view Raquel's "no problem" response, which to us appears innocuous and even positive, as evidence of pregnancy discrimination.

Even if we were to somehow invent a way that Raquel's comment could be con-

strued as a Mobile Paints insider's warning about a pervasive bias against pregnant women within the company, the comment cannot support an inference of pretext and discriminatory animus insofar as it was made: (1) two years and two months prior to Plaintiff's termination; and (2) by someone who had nothing to do with the decision to fire Plaintiff.

In *McMillan v. Massachusetts Society for Prevention of Cruelty to Animals,* 140 F.3d 288, 301 (1st Cir.1998), the First Circuit held that although stray remarks can sometimes enable a jury to conclude in Title VII cases that an employer's reasons for dismissing an employee are pretextual, the probativeness of such stray remarks is circumscribed when they are made in a situation temporally remote from the date of the employment decision. Given that Raquel's comment was made in October 2001, two years and two months prior to Plaintiff's eventual termination, we find the probative value of Raquel's comment greatly diluted by temporal remoteness. *Id.* (remarks occurring several years before challenged employment action are remote); *cf. Santiago–Ramos,* 217 F.3d at 55 (remarks within two weeks of discharge not remote); *Fernandes,* 199 F.3d at 583 (remarks at time of employment action not remote).

The *McMillan* court also questioned the probativeness of stray remarks made by nondecisionmakers like Raquel. 140 F.3d at 301. There is no "evidence to show that [Raquel] was in any way a decision-maker—or influenced the decision-makers—regarding [Plaintiff's] dismissal," and we therefore fail to see a clear nexus between the Raquel comment and the Plaintiff's eventual termination. *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 675 (1st Cir. 1996); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 10 (1st Cir.1990) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."). Plaintiff's description of her interactions with Raquel instead clearly indicates that Raquel arranged the meeting between Elba and Plaintiff during which Plaintiff was offered a job, but that Raquel did not actually make that employment decision herself. *Docket Document 19, Exh. 1.*

We, therefore, conclude that Raquel's nondecisionmaker status, combined with her comment's innocuousness and temporal remoteness from Plaintiff's discharge, effectively robs the comment of any alleged probativeness with regard to whether Mobile Paints' reason for firing Plaintiff is pretextual.

### c. *Plaintiff's Peer Supervision*

██ Plaintiff finally offers as evidence of discriminatory animus her deposition testimony that she was subject to a program of discriminatory peer supervision shortly after Elba learned of her second pregnancy in March 2003. *Docket Document No. 25, Exh. 3.* Plaintiff alleges that the peer supervision program's goal was to stockpile information so that Elba could later fire her for being pregnant, under pretext. *Id., Exh. 4.*

Mobile Paints, on the other hand, points to Plaintiff's controversial March 11, 2003, letter to Elba and Petit (in which she announced that she had decided to stop performing part of her job without a corresponding pay raise) as the reason the peer supervision program was ordered. *Docket Document No. 23, Exh. 6.* According to Mobile Paints, company management needed to know if and when Plaintiff stopped performing her duties so that operations would run smoothly. *Docket Document No. 18.* Plaintiff also conceded in her depositional testimony that the peer supervision program was motivated in part

by her March 11, 2003, letter: "At the moment they found out I was again pregnant and taking in consideration the memo I had before written is when they began to request the reports from the employees to inform that my work was inefficient." *Docket Document No. 25, Exh. 3.*

Mobile Paints goes on to argue that Plaintiff cannot presently cast the peer supervision program as pregnancy discrimination when, in an April 10, 2003, letter to Petit about discrimination allegations, she has explicitly stated that she did not feel the implementation of the peer supervision program "discriminated against [her] because of [her] pregnancy." *Docket Document No. 23, Exh. 11a; Docket Document No. 18.*

Plaintiff obviously recognizes the problem her April 10, 2003, letter poses to the admissibility of the peer supervision program as evidence of discriminatory animus at Mobile Paints, given her protestations that Petit and Elba pressured her to write it. *Docket Document No. 25.* Because Plaintiff offers no evidence to support this allegation of duress, we reject the argument and in fact note that Petit's April 4, 2003, and April 10, 2003, letters to Plaintiff reveal anything but hostile pressure for her to renounce her discrimination allegations: "If your answer [to whether the peer supervision program constituted pregnancy discrimination] is yes, we will immediately activate our procedure to solve internal complaints for discrimination to get details of your allegations, investigate, assign responsibilities, and take the corresponding corrective measures, if any violation of law or of our policy is found." *Docket Document No. 23, Exhs. 9, 11.* It is hard to imagine how Mobile Paints could have framed a more fair, non-leading invitation for Plaintiff to articulate her pregnancy discrimination allegations more clearly.

d. *Summary*

Given our view that Plaintiff has failed to provide any facts indicating that Mobile Paints' economic justification for her discharge is a sham, we find no possibility on this record that a reasonable fact-finder could conclude that a preponderance of the evidence shows that the company discriminated against Plaintiff because she was pregnant or took maternity leave. We, therefore, find that Plaintiff's pregnancy discrimination claim fails to pass muster and must be dismissed with prejudice.

### C. *Supplemental Claims*

Because all of Plaintiff's federal claims have been dismissed, we decline to exercise supplemental jurisdiction over her associated Commonwealth claims. *Rivera v. Murphy,* 979 F.2d 259, 264 (1st Cir. 1992) (quoting *Cullen v. Mattaliano,* 690 F.Supp. 93 (D.Mass.1988) ("[I]t is the settled rule in this Circuit that in a non-diversity case, where pendent state claims are joined with a federal cause of action and that the federal cause of action is [dismissed] ... the pendent state claims should be dismissed.")).

### V.

### *Conclusion*

For the reasons stated herein, we **GRANT** Mobile Paints' motion for summary judgment, and dismiss Plaintiff's complaint with prejudice.

**IT IS SO ORDERED.**